[No. G021825. Fourth Dist., Div. Three. Nov. 8, 2000.]

CHARLES E. PRICHARD et al., Plaintiffs and Respondents, v. LIBERTY MUTUAL INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Kern and Wooley, Ronald J. Skocypec, Lisa M. Kralik and Melodee A. Yee for Defendant and Appellant.

The Ford Law Firm, William H. Ford III and Paul C. Cook for Plaintiffs and Respondents.

## OPINION

## SILLS, P. J.—

### I. SUMMARY

Procedurally, this liability insurance bad faith action comes to us contorted as a sheepshank knot. Some unraveling is necessary.

The trial court filed a judgment ruling:

—The insurer had a duty to defend the underlying "mixed action" to the end;

—The insurer breached its duty to defend by trying to reserve its rights to obtain reimbursement of attorney fees expended in an appeal of the underlying action even though the insurer, in conjunction with another insurer, had paid for the defense of the underlying action;

—The insurer was estopped to assert its rights to contest coverage of the one cause of action (defamation) that was potentially covered in the underlying action because it breached its duty to defend. (Ironically, the trial court also held, in ruling on an in limine motion regarding *costs*, that there was no coverage because the defamations occurred outside the policy period.) As a result, the policyholder was awarded about $218,000 for the indemnification of the defamation claim;

—However, the insurer had *not* acted in bad faith;

—And, the insurer did *not* owe the costs awarded against the insureds in the underlying action.

Then the trial court filed an order granting a partial new trial, so the insured could seek recovery of damages for bad faith and for the costs in the underlying action. The insurer appealed from both the judgment and the new trial order.

At the time, the trial court did not have the benefit of *Buss v. Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766] (*Buss*), which was decided about a month after the new trial order. As we explain below, *Buss* greatly clarified the law concerning an insurer's right to seek reimbursement of defense fees in a "mixed action" (one where at least one cause of action is potentially covered, but the others are not), but in so doing rejected the theory used by the trial court to conclude that the insurer here had breached its duty to defend. In fact, *Buss* plainly rejected the idea on which the policyholders have predicated much of their case: that *new*

*consideration*, in addition to that provided in the insurance contract, is necessary for the insurer to have a right of reimbursement. As *Buss* makes clear, an insurer does nothing wrong in unilaterally reserving its reimbursement rights in a mixed action.[1]

Now, in the light of *Buss*, it is apparent that the trial court's decision about the breach and estoppel cannot stand. The insurer cannot be estopped to assert a defense because of a breach it did not commit. In the wake of that determination, it is clear that the $218,000 indemnification award, based on the underlying defamation judgment, must be reversed. To be fair to both parties, the question of whether the defamation award is actually covered must be remanded for decision in the trial court, since it was never really litigated there the first time.

Ironically, as it turned out, the trial court was also wrong in deciding in *favor* of the insurer on the question of costs in the underlying suit. But it corrected that error by granting the policyholders a new trial on the issue. In a word, the insurance contract obligates the insurer to pay "costs" whenever it must defend the suit, independent of whether those costs would otherwise be covered by way of the insurer's indemnity obligation. (See *Insurance Co. of North America v. National American Ins. Co.* (1995) 37 Cal.App.4th 195, 206-207 [43 Cal.Rptr.2d 518].)

In light of these determinations, both the judgment and the new trial order will have to be affirmed in part, and reversed and remanded in part as follows:

—The judgment is affirmed to the extent it declares the insurer had an obligation to defend the policyholders in the underlying action until its conclusion, and not just through the close of evidence at trial;

—The judgment is reversed to the extent it declares the insurer breached its obligation to defend the policyholders, and we direct the trial court to enter a new judgment ruling that the insurer did not so breach;

—The judgment is reversed to the extent it declares the insurer could not assert a policy period defense to coverage, and the matter is remanded for further proceedings;

---

[1]Precisely describing the insurer's right of reimbursement in cases such as this is a mouthful. In her dissent in *Buss*, it took Justice Kennard six lines in the official reporter to describe the majority holding concerning that right. (See *Buss, supra,* 16 Cal.4th at p. 62 (dis. opn. of Kennard, J.).) Hence, when we speak of the "reimbursement right" or similar words in this opinion, it is shorthand for the right to seek reimbursement of defense costs for claims that were never even potentially covered in "mixed actions," that is, those actions where the suit against the policyholder includes at least one claim that was potentially covered and therefore triggered the duty to defend.

—The judgment is affirmed to the extent it declares the insurer did not act in bad faith;

—By the same token, the new trial order is reversed to the extent it contemplates a new trial to allow the policyholders to recover bad faith damages;

—On the other hand, the new trial order is affirmed to the extent it contemplates the recovery of the costs awarded against the policyholder in the underlying action.[2]

## II. THE UNDERLYING CASE

By the late 1980's, the Johnston Yogurt company[3] was losing money and was in need of cash. A wealthy Sacramento-area egg farmer named Edward Minni loaned some $600,000 to Johnston Yogurt. The company still didn't turn a profit, so Minni agreed with Charles E. Prichard, kingpin of Johnston Yogurt,[4] to put in more money (bringing his input to $1 million) in return for an agreement whereby Minni became a 50 percent shareholder, had a seat on the company's board, and one of Minni's trusted associates, William Evans, would have one as well.

Minni was elderly, and looked to Evans to act as his "eyes and ears." Prichard, however, reneged on the deal, and found ways (the details of the corporate machinations are irrelevant here) to exclude both Minni and Evans from the company. Prichard went so far, in fact, as to have the Johnston Yogurt plant in Sacramento stripped of its equipment, which was taken for use by another company under his control.

Minni, Evans and related parties filed a lawsuit against Prichard and related parties in June 1991 for a variety of causes of action (breach of contract, misrepresentation, violation of various provisions of the Corporations Code, breach of fiduciary duty, etc.) related to Prichard's actions in excluding them from the company. One of these causes of action was for defamation. After the Johnston Yogurt plant had been shut down and Minni and Evans had been effectively ousted as directors of the company, Prichard

---

[2]As we explain later, the affirmance only applies to two of the plaintiffs, Charles E. Prichard and La Carona Foods. As a technical matter, the new trial motion is reversed as to the remaining plaintiffs.

[3]By Johnston Yogurt, we refer to a variety of entities used by Charles E. Prichard, including Button Industries and La Carona Foods. The precise relationship between these entities is not relevant to this insurance litigation, though of course it played a role in the underlying corporate litigation.

[4]We will not attempt to describe the precise legal relationship between Prichard and Johnston Yogurt; there seems to be no dispute that the Liberty Mutual Insurance Company policy covered Prichard.

allegedly began to tell people in the industry that Evans was stealing from Johnston Yogurt. The charging language in the complaint was that Prichard had at least one conversation with two executives in the food industry in which "Prichard stated that Evans stole from [the Johnston Yogurt company] and was dishonest in his capacity as an officer of [that company]."

Prichard requested a defense of the underlying action in July 1991 from Liberty Mutual, and two other Johnston Yogurt insurers, Aetna Casualty and The Standard Fire Insurance Company. He got what he requested. In the words of Prichard's own separate statement of undisputed facts later submitted in connection with a summary adjudication motion filed in 1996, "Liberty provided the Prichard parties a defense [of the Minni action] under a reservation of rights set forth in Liberty's 5/27/92 letter to the Prichard parties."[5] (Indeed, even though the respondent's brief refuses to acknowledge it, Liberty, in conjunction with Aetna, *has paid all the defense costs of the underlying action.*)

Liberty's May 1992 letter accepting the defense did not even mention any reimbursement of defense costs. The letter plainly accepted the defense of the action. Most of the letter involved notice of various coverage defenses, such as Prichard's own knowledge of the falsity of the allegedly defamatory statements, whether the defamatory statements took place before the beginning of the policy period (which began Mar. 22, 1991), and whether various of the Prichard parties might have acted outside their corporate capacities for their own benefit. The letter also reserved the right to withdraw from the defense "should facts develop which establish a lack of coverage under our policy, or if all potentially covered allegations or counts are dismissed from this action."

Minni's underlying action against Prichard came to trial in January 1995. During the trial, Liberty Mutual wrote a letter which, while explicitly not changing any position of Liberty's (including, presumably, Liberty's decision to provide a defense), advised Prichard's independent defense counsel that testimony at trial appeared to show that the "first publication" of Prichard's accusation of Evans's dishonesty had been made in October 1990, prior to Liberty Mutual's policy period.

The underlying suit resulted in a judgment for some $1.35 million for Minni and about $245,000 (though some of that was later reduced to $218,000 to account for offsets) for Evans on the defamation claim. Both Evans and Minni were awarded $253,000 in costs. The judgment was

---

[5]It is a direct quote, but we omit the irritating use of all capital letters for parties' names often used at the trial level (and sometimes appellate level as well). Any other quotations following the same practice are similarly treated.

quickly appealed, and the case almost as quickly settled: The underlying suit was settled by Prichard (without Liberty's consent) in February 1996 for $1.33 million plus interest; as part of the settlement, Prichard agreed to dismiss his appeal.

## III. THIS CASE

Now, to how this insurance bad faith litigation wound itself up into a procedural pretzel. Prichard's complaint was first filed in April 1995, while the underlying case was still in progress. Liberty Mutual was not even mentioned as a defendant in the initial complaint, which listed only Aetna Casualty and The Standard Fire Insurance Company. In May, however, Aetna brought in Liberty Mutual on a cross-complaint for declaratory relief. Liberty filed its own cross-complaint for declaratory relief in October, and by late November 1995 Prichard was allowed to file a first amended complaint adding Liberty Mutual as a defendant.

After the filing of a supplemental complaint in October 1996, the Prichard parties ended up with an amended complaint asserting 11 causes of action against Liberty Mutual, Aetna, and The Standard Fire Insurance Company. Of these, Nos. 3 and 7 were only asserted against Aetna and Standard, which settled in March 1996. Number 9, conspiracy to commit bad faith, had been knocked out on demurrer in April 1996.

Prichard was successful, in a summary adjudication motion heard in October 1996 as to cause of action No. 1, in seeking a declaration of Liberty's obligation to defend the underlying action to the end: Liberty was contending that its duty to defend Prichard terminated on February 2, 1996, when the evidence closed in the underlying action. (Liberty asserted that the uncontradicted testimony from the action was that Prichard had accused Evans of having stolen from Johnston Yogurt prior to October 10, 1990, that is, before the Liberty policy period.)

Prichard prevailed on the motion. The court declared that Liberty Mutual "was obligated to defend the *Evans/Minni* lawsuit until its conclusion." The notice of ruling given by Prichard's counsel, though, mentioned that "Liberty provided the Prichard parties a defense under a reservation of rights."

Causes of action No. 2 (asking for a declaration that Liberty was obligated to accept a certain pretrial settlement offer made by Evans and Minni in Jan. 1995) and No. 4 (asking for declaration regarding the effects of a partial settlement attempt made by the insurers), were dismissed with prejudice by Prichard in December 1996.

The balance of the causes of action, Nos. 5 (alleging a breach of duty to indemnify), 6 (bad faith refusal to settle), 8 (general bad faith withholding of

policy benefits), 10 (breach of contract on duty to defend), and 11 (asserting bad faith because of the reservation of rights letter regarding the appeal) all went to a court trial on legal issues (cf. Code Civ. Proc., § 592) in February 1997. Much of the case turned on a letter written by counsel for Liberty on December 1, 1995, involving the contemplated appeal by Prichard of the result in the underlying action.

Specifically, the letter dealt with Prichard's request that Edward Horowitz be retained as associate appellate counsel. The letter consisted of four paragraphs. The first paragraph acknowledged the request, and reiterated Liberty's position that its defense obligation had terminated, because the "undisputed evidence" at trial showed, among other things, that the "first publication" of the defamation exclusion applied. The second paragraph merely groused about the utility of "paying another attorney to gain familiarity with the underlying case."

The third paragraph then caved on the request, stating that Liberty *would* contribute "its proportionate share to retain Mr. Horowitz as associated appellate counsel under a strict reservation of rights" but then asserted (in language obviously alluding to Civ. Code, § 2860, subd. (c)) that because it "does not pay appellate counsel in Southern California $300 per hour for similar legal work," and because of a prior agreement between Liberty and the insureds, it would pay its share of $150 an hour for Horowitz's fees.

Finally, the fourth paragraph raised the reimbursement issue. We set that paragraph out now, in its entirety, to show that, contrary to the position strenuously advocated by Prichard in the respondents' brief, there was no "conditioning" of the duty to defend on any agreement between insurer and insured: "In agreeing to pay this share, Liberty Mutual fully reserves all of its rights available under the policies and California law, including all of the limitations on coverage and the payment of defense fees set forth in this correspondence, and prior correspondence. These rights include the right to seek reimbursement from the insureds for all of the defense fees paid on behalf of the insured from the date upon which the undisputed evidence adduced at the trial of the underlying action showed that there was no potential for coverage under the Liberty Mutual policies."

In late March 1997—with the Supreme Court's *Buss* decision still four months into the future—the trial court issued a statement of decision and judgment.[6] The court concluded that "By its letter dated 12/1/95, Liberty Mutual Insurance Company unilaterally attempted to condition the retention

---

[6]The trial court noted in its statement of decision that the appellate court decision in *Buss* was then "currently before" the Supreme Court, but cited it as having been written "by Crosby, J." In reality, the intermediate appellate decision in *Buss* was written by "Croskey, J."

of Edward Horowitz as appellate counsel in the *Evans/Minni* lawsuit on the 'right' of reimbursement of all defense fees paid on behalf of its insureds after the jury verdict in February 1995." The court further concluded that the state of the law was, at the time, that an insurer could not "so condition its defense." It further held that the letter constituted a breach of Liberty's "contractual duty to defend in connection with its condition that the retention of Edward Horowitz as appellate counsel on the appeal would be subject to a right of reimbursement of all defense fees paid on behalf of its insureds after the jury verdict in February 1995 in the *Evans/Minni* lawsuit."[7] From these conclusions, the court further held that Liberty was estopped to assert its defense that the defamation judgment against Prichard was not covered because the first publication had occurred outside the policy period. However, the court further concluded that because the law concerning an insurer's right to reimbursement was uncertain, Liberty's "breach" of its duty to defend was not "unreasonable."

The ensuing judgment stated that the plaintiffs would take nothing by reason of causes of action Nos. 2 (though that had already been dismissed), 5, 6, and 8, but would be indemnified for the defamation award in the underlying suit ($218,421). The judgment omitted any reference to Prichard's bad faith claim set forth in cause of action No. 11.

The judgment was filed March 28, 1997, though apparently the filed version was not served.[8] In any event, *Prichard* filed a new trial motion on April 15, seeking a new trial or modification of the court's statement of decision as to two issues: (1) Whether the $253,000 of costs assessed against Prichard in the underlying action was covered under Liberty's supplementary payments coverage, and (2) whether the court's ruling that Liberty's "wrongfully conditioning its defense on appeal on a claim of reimbursement was not unreasonable as a matter of law," i.e., Prichard still wanted to press a bad faith claim based on the December letter.

In early June the trial court *granted* the new trial motion, stating in a minute order that the "moving parties' positions are well founded."[9] By the end of the month Liberty filed a notice of appeal from both the judgment and

---

[7] The court made these statements under the aegis of "findings of fact," but they are obviously conclusions of law, since they make categorical judgments about facts, rather than neutrally stating the facts themselves.

[8] The proof of service on the filed judgment is dated March 17, indicating that that was the date the *proposed* judgment was served.

[9] Liberty's argument that the motion was denied by operation of law because the 60-day time limit specified in section 660 of the Code of Civil Procedure ("the power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 . . .") had already expired is unavailing. The minute order accompanying the judgment did *not* direct the clerk to mail notice of entry of judgment. (See *Van Beurden Ins. Services, Inc. v. Customized*

the new trial order. (Ironically, *Buss* was handed down by the high court the next month, in late July.) The question thus arises as to the precise posture of the case on appeal.

## IV. THE APPEALABILITY OF THIS CASE

■ Unraveling the appealability knot is not as hard as it might otherwise appear. Both parties agree, in response to supplemental briefing requested by this court when it appeared that not all causes of action had been disposed of, that cause of action No. 11 (for bad faith based on the Dec. 1995 reservation of rights letter) was omitted merely by inadvertence. *In substance,* cause of action No. 11 was subsumed within the trial court's determination that Liberty was not liable for bad faith and the provision in the judgment that Prichard take nothing by way of the more specific cause of action number 8 for unreasonable denial of policy benefits.

In such instances, the appropriate course is for the appellate court to amend the judgment to reflect the manifest intent of the trial court (*Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 308 [63 Cal.Rptr.2d 74, 935 P.2d 781]), which we hereby do. And, given that there was a final judgment, then, Liberty has the right to attack the judgment in an appeal from a partial new trial order. (See *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 329-330 [274 Cal.Rptr. 766] [explaining why a party can appeal from a partial new trial order and attack even those parts of the judgment that were not subject to the new trial order].)

## V. THE MERITS OF THE JUDGMENT

### A. *The Duty to Defend*

■ Liberty, of course, could not challenge the basic premise that it was obligated to defend the suit, at least at the time of tender: There was a clear potential for coverage under the portion of the policy which provides coverage for personal injury, defined as injury arising out of one of several "offenses," including "[o]ral . . . publication of material that slanders or libels a person." The only question is whether the trial court erred in ruling that Liberty was obligated to defend after the close of evidence in the underlying case, i.e., to provide a defense on appeal.

The usual formulation of the termination point of the duty to defend is "until the underlying suit is concluded" or—and we note the Supreme

*Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 64 [61 Cal.Rptr.2d 166, 931 P.2d 344] ["To avoid uncertainty, we clarify that . . . when the clerk of the court mails a file-stamped copy of the judgment, it will shorten the time for ruling on the motion for a new trial only when the order itself indicates that the court directed the clerk to mail 'notice of entry' of judgment"].) Thus, while we grant Liberty's request that we take judicial notice of the fact that Orange County is not a judgment book county, the fact does it no good.

Court's use of the passive voice—"it has been shown that there is *no* potential for coverage." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153], original italics.)

When precisely "it has been shown" there is no potential for coverage is an interesting question. Must an insurer obtain a declaratory relief judgment, or may it unilaterally withdraw? There is authority both ways, but in different contexts.

*Hartford Accident & Indemnity Co. v. Superior Court* (1994) 23 Cal.App.4th 1774 [29 Cal.Rptr.2d 32] put the onus on the insurer where there was no question of an *initial duty to defend*, but there was a dispute over whether policy limits had been exhausted and the duty to defend thus terminated. In that situation, the *Hartford* court observed that the insurer could not "unilaterally terminate a defense for which it potentially is responsible." (*Id.* at p. 1781.) Then again, the *Hartford* court emphasized that the insurer could obtain reimbursement from excess carriers for defense costs for the period "between actual exhaustion of policy limits and *proof* of exhaustion." (*Id.* at pp. 1781-1782, italics added.)

*Hartford* declared that the duty to defend continues "until the insurer proves otherwise" (*Hartford Accident & Indemnity Co. v. Superior Court, supra*, 23 Cal.App.4th at p. 1781), thus indicating that a judge should make the determination before an insurer can withdraw. We would add, apropos *Hartford*'s observation about reimbursement from excess carriers, that any injustice to the insurer resulting from the time or expense of the declaratory relief action can be offset by the insurer's ability to obtain reimbursement, either from carriers who were obligated to defend after the insurer ceased to be so obligated, or from the insured. After all, one of the major themes of the *Buss* case (as explained in more detail below) is that an insurer's right to seek reimbursement from an insured is implied in law as a matter of fairness to balance out the seeming unfairness of requiring an insurer to defend claims which it never contractually agreed to defend.[10]

On the other hand, *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165 [96 Cal.Rptr.2d 136] suggested a different

---

[10]The problem of actual recovery of defense costs in a reimbursement action has nuances which have yet to be explored. For example, could a policyholder, in defending a claim for reimbursement of defense costs, argue that its insurer conducted an inefficient defense, i.e., paid too much? In the legal marketplace of early 21st-century America, such a scenario is unlikely to arise because, in general, policyholders want more expensive lawyers, while the insurers are able to use economies of scale to provide cheaper lawyers.

The more likely inequity is that the policyholder (as distinct from a deep pockets excess carrier) simply won't be able to pay any reimbursement judgment, and the insurer will be in effect left paying for the defense of a claim it never contracted to defend. But that is simply a risk inherent in well-established rules requiring the insurer to defend the whole of a mixed action.

result where the insurer never actually had a duty to defend at all, but did so mistakenly. (*Id.* at p. 1192.) *Ringler* stated, "there is no particular requirement that an insurer ask the permission of a trial court before withdrawing from a defense, once the insurer has determined that no potential for indemnification liability exists." (*Ibid.*) While continuation of a defense might be "prudent," it is not required "on pain of suffering liability for defense and settlement expenses not actually covered" under the terms of the policy. (*Ibid.*)

Clearly, *Ringler* represents the easier of the two contexts. It would be unfair to say that an insurer must continue defending an action it never had any duty to defend in the first place pending a declaratory relief judgment, just because the insurer acted prudently and gave its policyholder the benefit of the doubt (or more precisely, the benefit of the doubt as to whether there even was a doubt), when it received the initial request for a defense. To require a declaratory relief judgment before it could withdraw would mean that the insurer would be better off if it had never defended at all. Thus *Ringler* is undoubtedly correct in stating that an insurer should not be "lock[ed] into" defending an action it is not required to, just because of the absence of a declaratory relief judgment freeing it. (See *Ringler Associates Inc. v. Maryland Casualty Co., supra,* 80 Cal.App.4th at p. 1192.) Indeed, the *Ringler* scenario happens every time an insurer correctly turns down a request for defense; no doctrine of insurance law requires it to run into court seeking a declaratory judgment attesting to the correctness of its decision. Mistakenly defending for a period of time is no different from that.

But *Ringler* cannot be applied to the genuine "mixed action" case as we have before us here, because in a mixed action case there *is* a duty to defend, at least at the beginning—and the question is, how does anyone—the court, the policyholder, the insurer—*know* when the duty ceases. We need not attempt to formulate a one-size-fits-all rule here; it is enough to decide that the trial court *here* correctly ruled that Liberty's duty extended beyond the close of evidence, and therefore Liberty was required to continue defending during the appeal.

Why? Because the underlying case was not yet over and it was *still* possible that Liberty might have had some indemnification liability, even after the close of evidence.[11]

Just because evidence has closed in the underlying case does not mean the facts against the policyholder have necessarily calcified. Here, a new trial

---

[11] A fact that distinguishes this case from dicta in *California Union Ins. Co. v. Club Aquarius, Inc.* (1980) 113 Cal.App.3d 243, 247 [169 Cal.Rptr. 685]. In a short, one-paragraph observation, the *Club Aquarius* court suggested that because the trial court in the underlying federal case had made it "clear" by formal findings of fact that "the [underlying] case, in fact,

might have been granted. Witnesses might have changed their stories or their memories might have improved.[12] The defamation judgment against Prichard could have been overturned, yet another take its place on remand. In short, the potential for indemnification liability continued into the appeal period. (Cf. *Jenkins v. Insurance Co. of North America* (1990) 220 Cal.App.3d 1481, 1492 [272 Cal.Rptr. 7] (dis. opn. of Wallin, Acting P. J.) ["an insurer's duty to defend may include, in an appropriate case, a duty to appeal"].)[13]

While the formal judgment filed March 28, 1997, did not mention the result of the earlier summary adjudication motion on the duty to defend, that was just an omission. Just as with cause of action No. 11, we hereby deem the judgment modified to incorporate the court's ruling. As so modified, the judgment is affirmed to that extent.

### B. *No Breach of the Duty to Defend*

■ We now come to the core of Prichard's case against Liberty: Whether Liberty "breached" its duty to defend by its reservation of rights letter sent December 1, 1995.

The trial court bought Prichard's argument that the right of an insurer to obtain reimbursement in a mixed action is, at root, contractual, so that there must be *new consideration,* in addition to that provided by the contract, to support a reimbursement claim. When *Buss* was handed down, however, it articulated a rule squarely to the contrary. *Buss* held that an insurer's right to seek reimbursement is *implied in law,* as a counterbalance to an insured's right, also implied in law, to have a defense of the *whole* of an action.

Despite *Buss,* Prichard *still* maintains that an insurer's reimbursement claim is contractual. His theory is revealed in one critical paragraph on page 16 of the respondents' brief, which is worth quoting in full now: "The evidentiary threshold for proving the existence of an *agreement to reimbursement* supported by consideration is low and dangerously easy to meet. In

---

did not involve the limited risk set forth in [the] policy," the insurer there had "the right to withdraw from the defense" at *that* point. In *Club Aquarius* there was no suggestion that an appeal in the underlying case might yet result in indemnification liability for the insurer, and so the court never contemplated that possibility in its dicta.

[12]In the present case, for example, there were two witnesses who testified to having heard Prichard accuse Evans of stealing equipment, but they could not remember *when* Prichard made the accusations. Perhaps their memories might have improved on retrial.

[13]The majority also believed the defense duty in *Jenkins* included a duty to prosecute an appeal. Justice Wallin's dissent, however, makes the valid point that the appellate system could not survive the proposition that insurers were *always* obligated to appeal any case they were otherwise defending. Other than the limited circumstances of this case, where it is clear that an appeal was going to be taken and the insurer was going to fund it anyway, we express no opinion as to whether and when an insurer must pay for an appeal.

*Buss*, the Supreme Court found a *modification of the policy* supported by new consideration where the insured responded to the insurer's reservation of the right to reimbursement by conceding it would reimburse the insurer for defense fees if a court ultimately determined reimbursement was owed. (*Buss, supra*, 16 Cal.4th at pp. 43, 60, fn. 27.) The insured did nothing more than *agree* to abide by any future legal determination of the right to reimbursement, and this was sufficient for the California Supreme Court *to find an agreement for reimbursement* supported by consideration." (Italics added.)

Wrong, wrong, wrong. The whole point of the *Buss* case is that an insurer's right to reimbursement for defense costs for never-even-potentially-covered-claims is predicated on a legal right "implied in law as quasi-contractual," not a matter of any agreement between the parties. As the *Buss* majority stated: "The insurer therefore has a right of reimbursement that is implied in law as quasi-contractual, whether or not it has one that is implied in fact in the policy as contractual." (*Buss, supra*, 16 Cal.4th at p. 51.)

That is the reason Justice Kennard dissented. She believed that unless the right to reimbursement is in the written contract, i.e., exists as a matter of agreement, not law, it shouldn't exist. To juxtapose the majority's position against her own, she characterized Justice Mosk's majority opinion as holding that "an insurance carrier that has defended its insured in a third party action seeking damages potentially within the policy's indemnity coverage may thereafter require the insured to reimburse the carrier for some of its defense costs *despite the absence of any agreement* between the carrier and the insured permitting such reimbursement." (*Buss, supra*, 16 Cal.4th at p. 62 (dis. opn. of Kennard, J.).) Justice Kennard rejected the quasi-contract implied-in-law model of insurer reimbursement adopted by the majority, arguing that "[i]nsurance policies are written contracts governed by the rules of contract law, not equity or quasi-contract." (*Id.* at p. 65.)

The majority in *Buss* most assuredly did not predicate the court's decision on the existence of an agreement for reimbursement supported by consideration. That much is absolutely clear from the critical text on pages 50-51 of the opinion explicating the court's rationale,[14] as well from Justice Kennard's dissent. The footnote relied on by Prichard here is mostly concerned with the need for insurers to give *notice* of its *unilateral* reservation

---

[14]Which we will now quote, including surrounding context: "As to the claims that are not even potentially covered, however, the insurer may indeed seek reimbursement for defense costs. Apparently, all the decisional law considering such claims in and of themselves so assumes. [Citations.] So has it been held: 'California law clearly allows insurers to be reimbursed for attorney's fees' and other expenses 'paid in defending insureds against claims for which there was no obligation to defend.' [Citation.] [¶] The reason is this. Under the

of the right to seek reimbursement. The footnote is very clear that an insurer can reserve its reimbursement right unilaterally and without any agreement: "We also note that the Court of Appeal was evidently of the view that the insurer can reserve its right of reimbursement for defense costs *by itself, without the insured's agreement*. Such a view is in accord with the 'modern trend.' [Citation.] More importantly, it is sound. Because the right is the *insurer's alone*, it may be reserved by it *unilaterally*." (*Buss, supra*, 16 Cal.4th at p. 61, fn. 27, italics added.)

It is the last two sentences of the footnote (though one appears to be a sentence fragment)[15] on which the policyholders here appear to have predicated their characterization of *Buss* as saying that some sort of agreement is necessary. Here are those sentences: "Not only did Transamerica [the insurer in *Buss*] reserve all its rights, contractual and otherwise [*sic*]. But, receiving consideration, Buss agreed thereto." (*Buss, supra*, 16 Cal.4th at p. 61, fn. 27.)

This language comes nowhere close to saying that an agreement is necessary. It merely observes that the policyholder in *Buss* did impliedly agree to a reservation by virtue of receiving "consideration." And while the nature of that "consideration" was not specified by the high court in the footnote, a reader can gather from the main text that the court was referring to an insurer's providing *a defense of claims for which the policyholder never bargained*, which is the main theme of *Buss's* rationale: "With regard to defense costs for these claims, the insurer has not been paid premiums by the insured. It did not bargain to bear these costs. . . . [¶] . . . Without a right of reimbursement, an insurer might be tempted to refuse to defend an action in any part—especially an action with many claims that are not even

---

policy, the insurer does not have a duty to defend the insured as to the claims that are not even potentially covered. With regard to defense costs for these claims, the insurer has not been paid premiums by the insured. It did not bargain to bear these costs. To attempt to shift them would not upset the arrangement. [Citation.] The insurer therefore has a right of reimbursement that is implied in law as quasi-contractual, *whether or not it has one that is implied in fact in the policy as contractual*. As stated, under the law of restitution such a right runs against the person who benefits from 'unjust enrichment' and in favor of the person who suffers loss thereby. The 'enrichment' of the insured by the insurer through the insurer's bearing of unbargained-for defense costs is inconsistent with the insurer's freedom under the policy and therefore must be deemed 'unjust.' " (*Buss, supra*, 16 Cal.4th at pp. 50-51, italics added, fn. omitted.)

The footnote that was omitted was just as plain: "That the insurer does not have a right of reimbursement express in the policy does not mean that it does not have one implied in law. Rather, that *it has an implied-in-law right* helps explain why it does not have an express-in-policy one." (*Buss, supra*, 16 Cal.4th at p. 51, fn. 13, italics added.)

[15]Which have their uses, stylistically.

potentially covered and only a few that are—lest the insurer give, and the insured get, more than they agreed." (*Buss, supra,* 16 Cal.4th at pp. 51-52.)[16]

Indeed, the underlying rationale for the rule in *Buss* is one that goes hand in hand with an insurer's *unilateral* reservation of reimbursement rights. Essentially, the *Buss* court said: "What's good for the goose is good for the gander." That is, the well-established duty of an insurer to defend the *entirety* of a "mixed action," i.e., one in which "some of the claims are at least potentially covered and the others are not" (see *Buss, supra,* 16 Cal.4th at p. 48) is *not* founded in the contractual agreement, but is itself imposed by law: "We cannot justify the insurer's duty to defend the entire 'mixed' action contractually, as an obligation arising out of the policy, and have never even attempted to do so. . . . [¶] That being said, we can, and do, justify the insurer's duty to defend the entire 'mixed' action prophylactically, as an obligation *imposed by law in support of the policy*." (*Id.* at pp. 48-49, italics added.) The insurer's reimbursement right merely *balances out* the insured's right to a defense of the entirety of a mixed action.

Prichard's use of the phrase "unlawfully conditioned" to describe Liberty's December 1, 1995 reservation of rights letter[17] is thus not only inaccurate, but unfair, mangling the word "conditioned" beyond any meaningful recognition.[18] Liberty did not say: "We won't defend this action *unless* you agree to let us seek reimbursement later." Rather, Liberty said: "We will defend you *and* we reserve the right to seek reimbursement."

---

[16]Putting the *Buss* rationale in its most contractual terms, at the absolute most what the court was implying in footnote 27 is that an insured receives consideration every time a defense is provided for the whole of a mixed action, and that this consideration forms the basis for an implied-in-*law* agreement to allow the insurer to seek reimbursement. The critical difference between this formulation, and the policyholders' here, is that no *new* consideration is required to support the insurer's reimbursement right beyond the provision of a defense to the whole of a mixed action in the first place.

[17]The best example is in the respondents' brief: "Prichard demanded Liberty's performance of the defense duty without modification. [Citation to record.] Liberty, however, refused to retract, and thereby rendered Prichard vulnerable to its later claim that the 'benefit' of the defense had been 'accepted' with knowledge of the reimbursement claim. On these facts Liberty would claim an implied-in-fact agreement. [Citation to Civ. Code, § 1621]. Liberty's refusal to defend without withdrawal of the unlawful condition was a poison seed which Liberty attempted to plant as evidence Prichard had 'acquiesced' in Liberty's defense subject to the condition of reimbursement of defense fees for potentially covered claims."

We deal later with the insinuation, not supported by the record, that Liberty tried to reserve the right to recoup defense fees for potentially covered claims, as distinct from never-even-potentially-covered claims.

[18]One thinks of the scene in Brideshead Revisited (Waugh, 1945) where an English guest is invited into a London home for dinner, and throughout the dinner the host blithely talks to the guest as if the guest had grown up in the United States, to the guest's utter bewilderment. That is, there is a vague, surrealistic air to the contention that Liberty "conditioned" its defense. It is nothing more than playing with a category that doesn't fit.

Nor can Liberty's use of the phrase "all of the defense fees paid on behalf of the insured" somehow be contorted into a "conditioning" of a defense obligation it rightfully owed. Prichard makes much of the word "all," trying to make it seem as if Liberty were reserving the right to obtain reimbursement of the costs of defending even the potentially covered claims. But when the whole of the sentence is read *in context* it is clear that the reservation only refers to such fees as would *not* be owed under its duty to defend. The qualifying clause after the words "all . . . fees" which reads "from the date upon which the undisputed evidence adduced at the trial of the underlying action showed that there was *no potential for coverage* under the Liberty Mutual policies" shows the intention to limit the reimbursement claim to fees which Liberty never was obligated to pay in the first place.[19]

The trial court made a mistake that has been made by at least one other court (see *Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 677 [95 Cal.Rptr.2d 583] ["Here, the trial court applied the rule rejected in *Buss* that Old Republic's right to reimbursement required an agreement-in-fact or understanding between Old Republic and FSR"].) And the mistake is all the more understandable in light of the fact that *Buss* had not yet been handed down by the Supreme Court when the judgment and new trial orders were made. Even so, a mistake it was: It was clear error for the trial court to have concluded that the insurer had breached its duty to defend by unilaterally reserving its rights. By the same token, it would be beyond the bounds of reason to give Prichard a partial new trial on the bad faith claim when there was no breach and therefore no bad faith.

Prichard's contention that Liberty "breached" its duty to defend by "conditioning" its "defense obligation on *retroactive* termination of its obligation" (italics added) is a mere variation on the main argument, and is likewise untenable. The salient fact is that Liberty did, in fact, defend the whole of the underlying action. A "retroactive termination" is simply an ominous phrase for "reimbursement right," and *Buss* plainly allows for insurers to have reimbursement rights.

---

[19]Early in this opinion we decided that the trial court was correct in concluding that Liberty's defense obligation did not necessarily end at the close of evidence, and that a judicial determination was needed. It does not follow, however, from our decision that Liberty still could not seek *reimbursement* of fees expended after the time when, to quote from the reservation of rights letter, "undisputed evidence adduced at the trial of the underlying action showed that there was *no potential for coverage* under the Liberty Mutual policies." The basic theory of *Buss* is that because there are times when an insurer *must* pay for, as a matter of law, a defense that it is not contractually obligated to pay, it should have the right, as a matter of law, to seek reimbursement of the costs of that defense. Reimbursement of defense fees not owed is a different concept than the idea that it is only a court, and not the insurer acting as judge in its own case, who can determine *prospectively* when the duty to defend ceases.

Prichard also argues that Liberty somehow breached the duty to provide a defense by *sharing* the whole of the defense costs with Aetna. In the words of the respondents' brief, "Prichard had the right to demand full performance from Liberty, unreduced by performance from Aetna." Because all reasonable defense costs have been paid by the two insurers, Prichard's argument is as frivolous as it is inequitable. In essence, Prichard is saying that Liberty was under an obligation to double pay defense counsel.

It is, of course, well established that courts can order the sharing of defense costs "where coverage is provided by more than one insurer." (See *Continental Cas. Co. v. Zurich Ins. Co.* (1961) 57 Cal.2d 27, 36 [17 Cal.Rptr. 12, 366 P.2d 455].) It is nothing less than silly that several insurers should *each* be required to pay the whole of an attorney's bill, subject to—well what? A right of reimbursement from the lawyers for the *overpayment*? There was clearly no breach by Liberty in paying only its share of the defense costs. Prichard's real argument in this regard is that he had to pay Horowitz's fees to the extent those fees exceeded $150 per hour, and that therefore Liberty had not provided him a "full defense."

Not so. Horowitz was clearly *Cumis* counsel—Liberty was already funding the appeal—hence the reference to Horowitz acting as "associate" counsel. Since Prichard points to no evidence that *Liberty* actually pays appellate attorneys who are "retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended" (see Civ. Code, § 2860, subd. (c)) more than $150 an hour, asserting that Liberty was not providing a "full defense" is not persuasive.

The judgment was incorrect in declaring that Liberty "breached" the duty to defend, and, in the wake of that determination, could not raise the defense to Prichard's indemnification claim. We now turn to the indemnity question.

### C. *The Merits of the Indemnification Claim*

Because the trial court erroneously concluded that Liberty had breached its duty to defend merely by reserving its reimbursement right, it held that Liberty was estopped to assert a policy period defense to the defamation award. This error creates yet more complications.[20]

In the course of ruling on the question of the *costs* in the underlying action, the trial judge plainly stated: "Liberty has shown that there was no

---

[20]One complication, however, that we are spared is whether the settlement of the underlying action without Liberty's consent operates as a *per se* barrier to any indemnity recovery by Prichard. While Liberty argues that the settlement operates as a bar to any claim for *costs*

coverage for defamation, no defamatory statements within the policy period, so the insurance does not apply." The trial court further noted that the policyholders made no argument that the defamatory statements had been made in the policy period.

The problem is, because the trial court erroneously concluded that Liberty was estopped to disclaim coverage based on the absence of actual defamation within its policy period, Prichard never had the opportunity to attack the trial court's "ruling" that there were "no [defamatory] statements within the policy period," particularly given that the ruling arose in the context of the cost issue (the merits of which we discuss in the next section) and not the indemnification of the defamation award.

It would be unfair to try to determine the merits of the claim for indemnification of the defamation award in this appeal. The reason is that there are two aspects of Liberty's policy period defense to that claim, but each aspect entails a distinctly different burden. First, Liberty's insurance contract had an insuring agreement requiring that defamation be committed "during the policy period"[21] for there to be coverage. An insured, such as Prichard here, has the burden of establishing that his or her claim comes within the "scope of basic coverage." (See *American Star Ins. Co. v. Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1325 [284 Cal.Rptr. 45]; see also *Royal Globe Ins. Co. v. Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435].) On the other hand, Liberty's contract also contained an exclusion for defamations whose "first publication took place before the beginning of the policy period." The insurer has the burden of establishing the applicability of an exclusion. (See *American Star, supra*, 232 Cal.App.3d at p. 1325; *Royal Globe, supra*, 181 Cal.App.3d at p. 537.) Thus Liberty would have the burden of establishing that—even if there *were* defamations inside its policy period—the "first publication" of those defamations was before the policy period.

Because the trial court erred in concluding that Liberty could not assert a policy period defense, it would be meaningless to try to determine, on appeal, whether Prichard carried the burden of showing defamations during the policy period, or whether, that burden having been carried, Liberty then carried its burden of showing that the first publication of those defamations occurred before its policy period. The ruling that Liberty was estopped

taxed against Prichard in the underlying suit (an issue that we discuss below), it does not argue that the very fact of a settlement without consent bars Prichard's indemnity claim.

[21]Under "Insuring Agreement," the policy stated: "This insurance applies to 'personal injury' only if caused by an offense: [¶] (1) Committed in the 'coverage territory' during the policy period . . . ."

meant the trial court never engaged in the process of determining who carried which burden in the first place. Accordingly, the matter must be remanded, to give the parties the opportunity for the first time to carry their respective burdens.

 A loose end on the indemnification question is whether Liberty might be entitled to an offset for sums paid by Aetna to settle the case against it (though the issue might be rendered moot if the trial court rules in Liberty's favor on the indemnification claim on remand). Liberty claims in this appeal that the trial court erred in denying it any offset for a $600,000 settlement paid by Aetna. The theory is that since Prichard received a complete defense from both Aetna and Liberty together, the $600,000 represents a windfall to Prichard given that the defamation award was only about a third of that sum. The settlement, as one would expect, was unallocated between various claims Prichard had against Aetna.

On the offset point, the trial judge was correct. It cannot be inferred that the $600,000 settlement necessarily included *any* portion attributable to the defamation award. The record here, for example, voluminous as it is, does not necessarily contain all the evidence that might have borne on Prichard's bad faith claims against Aetna. Aetna may have been willing to pay the $600,000 sum just to avoid whatever bad faith exposure its lawyers might have imagined it had.

### D. *The Cost Claim*

 Ironically, the trial judge's ruling on the merits of the policy period defense was not applied to Prichard's request for indemnification, but was applied to deny his request for an award of the some $253,000 in costs that were assessed against him in the underlying action. The large amount of the costs can be traced to Minni's being able to collect his attorney fees pursuant to prevailing party clauses.

The cost claim is not, as Liberty suggests here, a substantive replay of the indemnity issue. The policy, in essence, obligates the insurer to pay the *costs* in any lawsuit it *defends*.

The supplementary payments provision provides in part: "We will pay, with respect to any claim or 'suit' *we defend*: [¶] . . . [¶] 5. All costs taxed against the insured in the 'suit.' " A "suit" is defined to mean "a civil proceeding in which damages because of . . . 'personal injury' . . . to which this insurance applies *are alleged*." (Italics added.)

As the italicized words indicate, the supplementary payments provision providing all "costs taxed" is a function of the insurer's defense obligation,

not its indemnity obligation. Liberty's contention that its insurance policy would not "apply" to a defended mixed action where there is no actual coverage is belied by the direct references to the defense obligation and the allegation of damages.

The case law is in accord. In *Cutler-Orosi Unified School Dist. v. Tulare County School etc. Authority* (1994) 31 Cal.App.4th 617, 630 [37 Cal.Rptr.2d 106], the appellate court rejected the idea that because the plaintiffs in the underlying action (a civil rights action under the Voting Rights Act of 1965) had a substantive claim for attorney fees, there was any possibility of indemnity for damages. Just because the underlying plaintiffs could collect attorney fees as part of the underlying action did not mean those attorney fees were potentially covered damages implicating the duty to defend. The court noted that awarded attorney fees are "inconsistent with the concept of 'damages.'" (*Id.* at p. 632.)

Even more to the point is *Insurance Co. of North America v. National American Ins. Co., supra,* 37 Cal.App.4th 195, 206-207, which held that costs awarded against the insured because of prevailing party attorney fee clauses applicable in the underlying litigation were part of the supplementary payments section of the policy. As the case also noted, such attorney fees are statutorily defined as costs. (*Id.* at p. 206.)[22]

The question then arises as to the settlement of the underlying case. Is the settlement, as Liberty now argues, an *automatic bar* to any claim for the costs that were "taxed" against Prichard in the underlying suit, given that the cost award existed only for the short period of time between the judgment and the settlement?[23]

Answer: no. The settlement of the whole underlying suit included the cost award. An insurer doesn't necessarily escape an indemnity obligation just because a case is settled (e.g., *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1307-1308 [77 Cal.Rptr.2d 296]; see also *Collins Development Co. v. D. J. Plastering, Inc.* (2000) 81 Cal.App.4th 771, 776 [97 Cal.Rptr.2d 83] [general principles of indemnity where indemnity

---

[22]It may be the case, as suggested by Liberty, that the absence of even the possibility of coverage for the causes of action that generated the large cost award is somehow unfair because the insured is getting a benefit he never paid for by being *in effect* indemnified for exposure on claims the defense of which he never paid a premium for. The problem, however, is in the insurance contract, not the law. If the ISO (Insurance Services Office) forms are written so that attorney fees awarded as part of prevailing party clauses can be considered costs associated with the insurer's *defense* obligation, there is nothing we can do about it.

[23]The speed of the settlement in the wake of the judgment obviates any argument that Liberty somehow "breached" its defense duty by not immediately cutting a check for the amount.

settles without trial]), so there is no reason that there should be any per se immunity from the supplementary payments obligation, particularly given that such payments (unlike the classic indemnification obligation but like defense costs), are independent of actual coverage.

The trial court was thus well within the bounds of reason to grant a new trial as to the costs issue. We need not comment further on the issues that might be part of any new trial.

There is, finally, the question of the standing of certain of the Prichard parties at the retrial, though it is probably only an academic matter. Only two of the Prichard entities, Prichard himself and La Carona Foods, were sued on the one potentially covered cause of action, defamation. From this it follows that only they were owed a defense, and from that we must conclude that only they have a claim for the "costs taxed" in the underlying action. As a housekeeping matter, then, the plaintiffs on retrial will only be Prichard and La Carona. (The new trial order, then, is technically reversed insofar as it applies to any other plaintiffs than Prichard and La Carona, but is affirmed as to them.)

## VI. *Dispositions*

To recap our conclusions: Liberty defended the underlying action, and did not breach its duty to defend. Ergo, Liberty did not breach the contract in bad faith, and therefore was not estopped to assert a policy period defense. The merits of that defense must be tried on remand. Likewise, because the insurance contract obligated Liberty to pay all costs in any lawsuit it defends, Prichard certainly may have a new trial in which to seek the costs assessed him in the underlying action.

The judgment and new trial order are affirmed in part and reversed and remanded with directions in part, in accord with the summary provided at the beginning of this opinion. Given the split decision, each side will bear its costs in this appeal.

Crosby, J., and Bedsworth, J., concurred.

A petition for a rehearing was denied December 6, 2000, and the opinion was modified to read as printed above. Appellant's petition for review by Supreme Court was denied February 14, 2001.