[No. B179851. Second Dist., Div. Three. Mar. 21, 2007.]

GOLDEN EAGLE INSURANCE CORPORATION, Plaintiff and Appellant,
v.
CEN-FED, LTD., et al., Defendants and Appellants.

## COUNSEL

Haight Brown & Bonesteel, Jules S. Zeman, Valerie Ann Moore and Christopher Kendrick for Plaintiff and Appellant.

Jacob N. Segura for Defendants and Appellants.

**OPINION**

**CROSKEY, J.**—In its appeal, defendant Cen-Fed, Ltd. (Cen-Fed)[1] challenges the decision of the trial court that its commercial general liability insurer, plaintiff Golden Eagle Insurance Corporation (Golden Eagle), owed neither a defense nor an obligation to indemnify Cen-Fed for damages awarded against it in the underlying action filed by Washington Mutual Bank (WMB). That action was based on the breach of a lease for commercial premises between Cen-Fed as lessor and WMB as lessee. In its cross-appeal, Golden Eagle, which had provided Cen-Fed a defense to the underlying action under a reservation of rights, challenges the trial court's ruling that it was obligated to pay (pursuant to the supplementary payments provisions of its policy) the costs (including attorney's fees) awarded against Cen-Fed in WMB's underlying action in spite of the trial court's determination that Golden Eagle had neither a duty to defend nor indemnify the claims asserted in that action.

We conclude that the trial court correctly determined that Golden Eagle was not liable to indemnify Cen-Fed for the damages awarded against it in the underlying action. Moreover, since there was no coverage under the Golden Eagle policy for the WMB claims, as a matter of law, a duty to defend the underlying action never arose. As a result, Golden Eagle had no obligation to pay or reimburse Cen-Fed for the costs of suit and attorney's fees awarded to WMB because Golden Eagle's burden under the supplementary payments clause is an integral part of, and can be no broader than, its duty to defend. We therefore will amend the judgment by striking the order requiring such payment and, as so amended, the judgment will be affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

#### 1. *The Underlying Action*

Cen-Fed leased property to WMB in a commercial building in North Hollywood, California. The leased premises were portions of the basement and first floor of the building. The lease ran from November 1979 to November 2004, and WMB had an option to extend the lease.

---

[1] Cen-Fed is a limited partnership. Its partners, Edward Israel who does business as Wilshire Pacific Properties, Victor Israel, Albert Collins, and Wilshire Pacific Investments, were also sued by Golden Eagle. However, the partners were dismissed from the suit without prejudice.

The lease required Cen-Fed to maintain the structural elements of the building in a first class condition, keep the leased premises and the common areas in a clean and sanitary condition, and maintain, for WMB, a certain number and type of parking spaces. Under the lease, WMB was entitled to cure or cause to be cured any failure by Cen-Fed to comply with its lease obligations, and deduct the cost thereof from WMB's rental obligation. Paragraph 26(i) of the lease contained an attorney's fee clause: "In the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover all costs and expenses, including the fees of its attorneys in such action or proceeding, in such amount as the court may adjudge reasonable."

WMB sued Cen-Fed for breach of the lease and declaratory relief,[2] alleging that Cen-Fed had "failed to maintain and repair the [leased premises] in accordance with the terms and conditions of the lease" thereby depriving WMB of a part of its leased space, which required WMB to move its safe deposit boxes from the basement to the first floor, decreased the number of boxes WMB was able to rent out, and deprived WMB of the use of that first floor space for other purposes. WMB's complaint also alleged that the air conditioning, elevator service, and basement restrooms were not in good working order; the landscaping, common areas, interior walls and painting were not maintained to the extent required by the lease; and Cen-Fed did not meet its obligations regarding parking.

### 2. *The Insurance Policies*

Beginning in September 1997 and ending in September 2002, Golden Eagle insured Cen-Fed with policies of insurance that included general liability and commercial general liability coverage.[3] Additionally, Golden Eagle issued umbrella coverage policies to Cen-Fed, covering the period September 2000 to September 2002. Cen-Fed tendered the defense of the underlying suit to Golden Eagle, and it undertook the defense of Cen-Fed under a complete reservation of rights.[4]

---

[2] WMB also alleged a third cause of action for the negligent hiring and supervision of one George Perez who, it was alleged, had committed or threatened to commit certain intentional tortious acts against WMB employees. This claim, however, was at some point severed from WMB's other two causes of action and has been entirely ignored by the parties as a basis for any claim of coverage under the Golden Eagle policy. Cen-Fed does not argue that Golden Eagle had any duty to defend or indemnify the underlying action based upon this third cause of action in WMB's complaint. We will likewise disregard it in our consideration of the issues actually raised by the parties.

[3] The parties submitted to the trial court a joint abstract of policy provisions. We discuss the relevant provisions below in the Discussion part of this opinion.

[4] Unfortunately, it appears that the reservation of rights letter issued by Golden Eagle is not contained in the record on appeal. There are simply references to a "complete" reservation of

### 3. *The Instant Action*

While the underlying action was pending, Golden Eagle filed this suit against Cen-Fed, seeking a declaratory judgment that Golden Eagle had no duty to indemnify Cen-Fed for damages that might be awarded to WMB in connection with (1) Cen-Fed's alleged breach of its duty to maintain the air conditioning in proper working order (first cause of action); (2) repair costs incurred by WMB because of Cen-Fed's alleged breach of the subject lease (second cause of action); and (3) future restoration costs WMB would incur to restore and maintain the leased premises in the condition required by the lease agreement (third cause of action). Golden Eagle also sought a determination that it had no obligation to indemnify Cen-Fed for contractual attorney's fees that might be awarded to WMB in the underlying action. Finally, Golden Eagle sought a declaration that it had no duty to defend the underlying action.[5]

### 4. *The Verdict and Judgment in the Underlying Action*

WMB's case against Cen-Fed was tried to a jury, which determined that Cen-Fed had breached the lease by failing to properly maintain (1) the air conditioning in first class condition, (2) the basement from January 1, 1999 to December 31, 2001 in the condition required by the lease, and (3) the first floor leased space and all common areas, from September 26, 1996 to May 5, 2003, in the condition required by the lease.

The jury determined that these breaches of the lease, with respect to the first floor leased space and common areas, caused WMB to suffer a diminution in the value of its leasehold interest in the sum of $505,440. The jury, however, awarded zero damages for WMB's various individual claims of damages, including WMB's cost of maintaining a temporary air conditioning system, a refund of rent for the leased basement space, the cost to WMB to

Golden Eagle's right to deny coverage which Cen-Fed apparently does not dispute. Thus, it is not clear to us whether, in addition to reserving its right to assert any and all coverage defenses, Golden Eagle also reserved its right to seek reimbursement from Cen-Fed for the defense costs and expenses incurred by Golden Eagle in the conduct of its defense of the underlying action. (See *Buss v. Superior Court* (1997) 16 Cal.4th 35, 61, fn. 27 [65 Cal.Rptr.2d 366, 939 P.2d 766].) Whether or not a reservation of rights sufficient to embrace such right of reimbursement was provided to Cen-Fed will be a matter that the trial court may examine on remand.

[5] It does not appear, however, that Golden Eagle expressly alleged in its complaint any claim for reimbursement of defense costs, nor did it seek any declaration of its right to obtain such relief.

repair or restore first floor leased space and common areas to the conditions required by the lease, the cost of WMB's prior repairs and expenses, and "any other claim."

Judgment was thereafter entered on that verdict. As a part of that judgment, WMB, as the prevailing party, was awarded its costs of suit, including an award of attorney's fees, pursuant to the terms of the attorney's fee clause in the lease.

### 5. *The Trial Court's Decisions in the Instant Case*

The trial court granted Golden Eagle's motion for summary adjudication of issues on Golden Eagle's first three causes of action. The remainder of the case, with respect to Golden Eagle's prayer for a declaratory judgment that it (1) had no obligation to pay the attorney's fees awarded against Cen-Fed and (2) owed no duty to defend Cen-Fed, was tried to the court. It concluded that Golden Eagle had no duty to indemnify Cen-Fed for any part of the judgment because the damages awarded to WMB were not due to "property damage" or to an "occurrence" and furthermore, the "owned property" exclusion in the policies would preclude liability for indemnification. The court also concluded that to the extent that the jury verdict award (in WMB's underlying action) was based on a "personal injury" offense, and might otherwise be subject to indemnification under the primary policies, the "liability assumed in a contract" exclusion applicable to each policies' "personal injury" coverage would apply to eliminate any indemnity obligation.

Finally, the trial court determined that even though Golden Eagle had no duty to defend Cen-Fed in the underlying action, it was nonetheless liable (under the supplementary payments clause in the policies), for paying the costs of suit (including attorney's fees) awarded to WMB. The reason for this ruling (which is the sole subject of Golden Eagle's cross-appeal) was, in the words of the trial court, "[b]ecause Golden Eagle in fact defended the underlying action[,] the [supplementary payments provisions] in its policies obligate[] it to pay any cost award against its insureds, regardless of the court's determination that no duty to defend the underlying action was ever [owed]."

### CONTENTIONS ON APPEAL

As already noted, Cen-Fed appealed from the judgment in the instant case and Golden Eagle cross-appealed. Cen-Fed contends (1) WMB's damages occurred because of "property damage" caused by an "occurrence," (2) the personal injury exclusion for liability assumed in a contract does not apply

here, (3) the owned property exclusion for property damage does not apply here, and (4) the trial court abused its discretion when it excluded the relevant and admissible testimony of an expert witness regarding the drafting history of ISO CGL (Insurance Services Office, Inc., commercial general liability) forms, and FC&S (fire, casualty and surety) bulletins that articulate the insurance industry's own construction of relevant policy language.[6]

Golden Eagle disputes each of these arguments and further contends that, as a matter of law, there was no "property damage" caused by an "occurrence" and, due to a recent clarification of relevant case law, the personal injury provisions of the policy, as a matter of law, can provide no coverage in this case. In addition, Golden Eagle argues that the trial court erred when it imposed on Golden Eagle the requirement that it pay the costs (including attorney's fees) awarded to WMB and against the Cen-Fed in the underlying action.

## DISCUSSION

### 1. General Principles Applicable to Coverage Issues

■ "When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.] The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) It is the burden of the insured " 'to bring the claim within the basic scope of coverage,' " and the burden of Golden Eagle to prove exclusions to the coverage. (*Id.* at p. 16.)

■ With respect to the issue of an insurer's duty of defense, the applicable law is well settled. "An insurer must defend its insured against claims that create a *potential* for indemnity under the policy. [Citations.] . . . [¶] . . . [¶] The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage. [Citation.] When the duty, having arisen, is extinguished by a showing that no claim can in fact be covered, 'it

---

[6] In light of our analysis of this case and the conclusions that we reach, we have no need to discuss all of the issues raised by Cen-Fed.

is extinguished only prospectively and not retroactively.' [Citations.] [¶] On the other hand, 'in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. [Citation.]' . . . [¶] From these premises, the following may be stated: If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. *On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.*" (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655 [31 Cal.Rptr.3d 147, 115 P.3d 460], first italics in original, second italics added (*Scottsdale*).)

### 2. *Pertinent Policy Terms*[7]

#### a. *Definitions*

The policies at issue in this case include the following relevant definitions:

" 'Occurrence' means an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions." (Italics added.)

" 'Personal injury' means injury, other than 'bodily injury,' arising out of [among other things], . . . [t]he wrongful eviction from, wrongful entry into, or *invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.*" (Italics added.)[8]

" 'Property damage' means: [¶] a. Physical injury to *tangible* property, including all resulting loss of use of that property. . . . or [¶] b. Loss of use of *tangible* property that is not physically injured." (Italics added.)

#### b. *Coverage A Indemnity ("Occurrence Based" Coverage)*

Pursuant to the "coverage A" terms of the policies ("bodily injury and property damage liability"), Golden Eagle was obligated to pay, on behalf of

---

[7] These policy provisions are reflective of the relevant terms in all of the policies involved in this case and, as already indicated, were presented to the trial court in the form of an agreed "Abstract of Coverage Provisions."

[8] The two umbrella policies involved in this matter had slightly different wording. The relevant "offense" was described as "[t]he actual wrongful eviction from, *actual wrongful entry into, or actual invasion of the right of private occupancy of a room, dwelling or premises that a person legally occupies by or on behalf of the owner, landlord or lessor.* . . ." (Italics added.)

Cen-Fed, "those sums that the [Cen-Fed] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." "This insurance applies to . . . 'property damage' only if: [¶] 1) The . . . 'property damage' is caused by an *'occurrence'* . . . ." (Italics added.)

### c. *Coverage B Indemnity ("Offense Based" Coverage)*

Pursuant to the "coverage B" provisions ("personal and advertising injury liability"), Golden Eagle was obligated to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies." "This insurance applies to: [¶] 1) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you . . . ."[9]

### 3. *Golden Eagle Had No Duty To Indemnify Cen-Fed Under Coverage A*

Coverage A in the CGL policy is occurrence based coverage. It applies to property damage that is caused by an "occurrence." As noted above, that term is defined in the policy as "an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions." And "property damage" is defined in the policy as a physical injury to tangible property, including all resulting loss of use of that property or the loss of use of tangible property that is not physically injured.

In light of WMB's claim, any applicable occurrence based coverage depends on the existence of some "property damage." However, a review of the allegations in WMB's complaint shows that there was no claim for any physical injury to tangible property or for any loss of use of tangible property that was not physically injured. Rather, WMB's claim rested *entirely on Cen-Fed's alleged breach of the lease and the resulting economic damage*, including the need to replace its safe deposit boxes to the first floor leased premises, which resulted in fewer boxes being rented and the consequent denial of the use that first floor space for other purposes (that is, a loss of rental *income* and loss of *use* of leased space). The jury determined

---

[9] Certain exclusions apply to coverage B, including that coverage B does not apply to "personal injury" "[f]or which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement."

Cen-Fed's breaches of the lease constituted a diminution in the value of the lease, that is, the difference between the fair market value of WMB's leasehold interest if the leased premises were in the promised condition and the fair market value of those premises in their actual condition. WMB's leasehold interests were not tangible property; and WMB's claim against Cen-Fed did not seek to recover for damage to or the loss of use of tangible property.

■ Thus, WMB's complaint and theory of recovery against Cen-Fed did not constitute claims for "physical injury to tangible property" and therefore they did not constitute claims for "property damage." Rather, they amounted to claims for *economic harm* suffered by WMB *due to Cen-Fed's failure to perform its contractual obligations.* As stated in *Waller*: "The property loss section of the standard policy provides coverage for 'physical injury or destruction of tangible property which occurs during the policy term.' The focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses, violation of antitrust laws or nonperformance of contractual obligations. (See, e.g., *Gulf Ins. Co.* v. *L.A. Effects Group, Inc.* (9th Cir. 1987) 827 F.2d 574, 578 [no coverage under business general liability policy for insured's alleged nonperformance of contractual obligations . . . ]; . . . *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 303 [24 Cal.Rptr.2d 467, 861 P.2d 1153] [recognizing that 'a suit seeking recovery for injuries to intangible economic interests is not a suit "of the nature and kind" covered by a CGL policy'] . . . . As *Giddings* [v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 217, 169 Cal.Rptr. 278] observed . . . 'strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. . . .' " (*Waller, supra,* 11 Cal.4th at p. 17, citations omitted; see also *Miller v. Western General Agency, Inc.* (1996) 41 Cal.App.4th 1144 [49 Cal.Rptr.2d 55] [suit based upon sellers' failure to disclose defective plumbing was not an action seeking recovery for "property damage"].)

Conceptually, Cen-Fed's claim that the failure to maintain its building in the condition in which it contracted to maintain it is no more a "property damage" claim than the claim of any property buyer who fails to obtain tangible property in the condition promised or warranted. Such claims are for economic loss, not "property damage." For example, in *St. Paul Fire &*

*Marine Ins. Co. v. Coss* (1978) 80 Cal.App.3d 888, 892 [145 Cal.Rptr. 836], the court held the insured's failure to construct and provide a home in a workmanlike manner did not constitute "property damage." Similarly, in *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272 [142 Cal.Rptr. 681], the court held claims against the insured dealer arising from the lease and sale of cars allegedly in breach of implied warranties and express representations as to their condition were not "property damage" claims. The court explained: "There are no allegations suggesting that appellant's representations caused injury or damage to the automobiles. To the contrary, the damage was to the plaintiffs' pecuniary interests—the out-of-pocket loss caused by the fact that plaintiffs did not receive full value for the money paid for the purchase and lease of the automobiles. Such loss of anticipated value does not constitute an 'injury to or destruction of tangible personal property' as defined in the policy." (*Id.* at p. 279; see also *Warner v. Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029, 1034 [281 Cal.Rptr. 635].)

Although Cen-Fed attempts to do so, it is not entitled to justify an argument for coverage based on speculation about claims that have not been alleged or asserted. (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114 [44 Cal.Rptr.2d 272]; see also *Friedman Prof. Management Co., Inc. v. Norcal Mutual Ins. Co.* (2004) 120 Cal.App.4th 17, 35 [15 Cal.Rptr.3d 359] [the potentiality rule for duty to defend depends on "possibility of actual indemnity coverage, not the mere existence of a plausible argument"]; *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629] [insured's counsel sought to justify coverage by arguing that the third party complaint might be amended to allege property damage].)

This case is not like those relied on by Cen-Fed where the courts permitted a diminution in value of property as a measure of the plaintiffs' claimed physical injury to *tangible* property. (See *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 565 [334 P.2d 881]; *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 510, fn. 6 [42 Cal.Rptr.2d 295]; *Eichler Homes, Inc. v. Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532, 538 [47 Cal.Rptr. 843].) Here, diminution in value (of its leasehold interest) damages were awarded to the WMB for its *economic* loss in failing to receive the benefit of its lease, a nontangible property right. That was not covered by the terms of the Golden Eagle policies. (*Waller, supra,* 11 Cal.4th at pp. 17–18.)

Moreover, Cen-Fed's failure to discharge its contractual liabilities under the lease agreement was nothing more than a nonaccidental act of breach of contract. That is, whatever the nature of the managerial decisions made by Cen-Fed which led to its failure to fulfill its promised maintenance obligations, they were not the result of a fortuitous accident; and they thus could not have resulted in an "occurrence." (See, e.g., *Modern Development Co. v. Navigators Ins. Co.* (2003) 111 Cal.App.4th 932, 941–942 [4 Cal.Rptr.3d 528].) Thus, in addition to the absence of "property damage," it is also clear that the loss sustained by WMB was not caused by an "occurrence." (See, e.g., *Stein-Brief Group, Inc. v. Home Indemnity Co.* (1998) 65 Cal.App.4th 364, 372 [76 Cal.Rptr.2d 3].)

It is true that merely because a claimant has framed its complaint to allege a breach of contract coverage will not necessarily be precluded. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 840 [88 Cal.Rptr.2d 366, 982 P.2d 229].) That is because coverage under a liability policy does not depend on the form of the action or the legal theories asserted by claimant. Rather, coverage is determined by the nature of the loss (e.g., "property damage") and the risk that caused the loss (i.e., "accident" or "occurrence"). (*Id.* at p. 839.) Thus, irrespective of the form of the action or the theory asserted by the claimant, coverage under liability policy provisions, such as those before us (i.e., coverage A), the existence of coverage will depend upon allegations charging "property damage" caused by an "occurrence." (*Ray v. Valley Forge Ins. Co.* (1999) 77 Cal.App.4th 1039, 1045–1046 [92 Cal.Rptr.2d 473].) No such claim or allegations were ever made or asserted by WMB nor were they otherwise raised or tried in the underlying action.[10]

We conclude, therefore, that there was no actual or potential coverage, as a matter of law, under the coverage A provisions of the Golden Eagle policies.

---

[10] Cen-Fed argues, in part, that the allegations of paragraph 21(j) of WMB's complaint in the underlying action were sufficient to raise the possibility of coverage. In that paragraph WMB alleged, as one of several specific instances of how Cen-Fed had failed to fulfill its contractual obligations under the lease, that Cen-Fed's employees or agents had "threatened, harassed, and/or otherwise interfered with [WMB's] right of enjoyment of the [leased premises], and as a result thereof, [WMB] has incurred substantial expenses to protect itself from such threats and to mitigate the harm caused by this condition."

On its face, this allegation does not purport to do anything more than simply allege one of a number of alleged acts constituting a breach of the lease agreement by Cen-Fed. It does not allege an "accident" nor an "occurrence" and it does not claim that such alleged acts of Cen-Fed's employees resulted in any "property damage." It thus does not assist Cen-Fed's argument for coverage under the Golden Eagle policy. (See fn. 2, *ante.*)

### 4. *Golden Eagle Had No Duty To Indemnify Cen-Fed Under Coverage B*

"Personal injury," is defined as an injury (other than bodily injury) that arises out of one or more of five designated "offenses." Some of those five offenses specifically refer to offenses affecting "a person," while others either refer to offenses affecting "a person or organization" or do not designate either.[11] The pertinent offense for our purposes here is the wrongful eviction or entry into or invasion of the right of private occupancy of a room, dwelling or premises, which the policy specifically makes applicable only to *persons* occupying the premises, not to *persons and/or organizations*. Here, of course, the lessee of the subject leased premises was WMB, and WMB is a corporate organization, not a person. Thus, by its very terms, that premises-based offense is not applicable to Cen-Fed's *corporate* lessee.

 In *Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1070 et seq. [34 Cal.Rptr.3d 136] (*Mirpad*), a case that also involved a wrongful eviction claim and the personal injury coverage in a CGL policy with essentially identical language to the wrongful eviction language in the policies which we address here, we held that when an insurance policy consistently distinguishes between persons (natural persons) and organizations, the distinct meanings have to be applied by the courts. Based on the language of that policy, we held that the wrongful eviction offense was directed at victims who were *natural persons*, not organizations.

---

[11] The relevant specific policy language relating to coverage B is as follows: " 'Personal Injury' means injury, other than bodily injury, arising out of one or more of the following offenses:

"a. False arrest, detention or imprisonment;

"b. Malicious prosecution;

"c. *Wrongful eviction from, wrongful entry into, or invasion of the right private occupancy of a room, dwelling or premises that a person occupies by you and on behalf of its owner, landlord or lessor*;

"d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's organization's goods, products or services; or

"e. Oral or written publication of material that violates a person's right of privacy." (Italics added.)

The last of the five primary policies does not separately define "personal injury." Instead it defines "personal injury and advertising injury" to include:

"c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that *a person occupies*, committed by or on behalf of its owner, landlord or lessor . . . ." (Italics added.)

The two umbrella policy similarly defines "personal injury" and "personal and advertising injury" to include the following:

"c. The actual wrongful eviction from, actual wrongful entry into, or actual invasion of the right of private occupancy of a room, dwelling or premises that a *person legally occupies* by or on behalf of the owner, landlord or lessor . . . ." (Italics added.)

Thus, it is clear that each of the policies sets forth the relevant offense based coverage provision in substantially the same way.

The same result is compelled here. The *Mirpad* decision, which was filed after the entry of the trial court's judgment in this matter, makes it clear that there was no coverage, as a matter of law, available to Cen-Fed under the Golden Eagle policy for WMB's wrongful eviction or entry or invasion of right of privacy claim. Since that was the *sole* clause upon which Cen-Fed relied for its claim that there was coverage under the coverage B provisions of the policy, the principles set out in *Mirpad* are dispositive of the matter of "offense based" coverage.[12]

In light of that conclusion, we need not reach or discuss the potential applicability of the exclusions to the coverage B provisions.[13]

### 5. *Golden Eagle Is Not Obligated to Pay the Costs and Fees Imposed on Cen-Fed*

In the underlying action, WMB was awarded costs of suit against Cen-Fed. This included attorney's fees awarded pursuant to the attorney's fee clause in the lease. (See Code of Civ. Proc., § 1033.5; Civ. Code, § 1717, subd. (a).) In the instant action, the trial court ruled that, because Golden Eagle had in fact defended Cen-Fed in the underlying action, Golden Eagle had an obligation to pay those costs of suit in spite of the court's determination that there was

[12] Cen-Fed addresses the impact of *Mirpad* on this case by arguing that its claim for coverage under coverage B should still be viable because the flooding of the basement of WMB's leased premises resulted in the "eviction" of multiple safe deposit box holders whose boxes had been located in the basement area and at least some of those box holders were likely to have been natural persons. Apart from the speculative and factually unsupported nature of this argument, a similar contention was expressly rejected in *Mirpad*. (*Mirpad, supra,* 132 Cal.App.4th at p. 1075, fn. 15.)

[13] At trial, Cen-Fed proffered certain evidence as an aid to the trial court in the event the trial court needed the assistance in deciding the case. Cen-Fed sought to introduce the testimony of expert witness Pete Ligeros who would give an opinion on (1) whether there was CGL coverage for wrongful entry or eviction or other invasion of the right of private occupancy before the CGL broad form endorsement was issued, (2) the nature and function of contractual liability coverage, and (3) the insurance industry's understanding and use of the phrase "liability assumed in a contract or agreement" and whether it is ever applied to situations other than indemnity and hold harmless agreements. The trial court declined the proffered evidence by ruling these were issues of law for the trial court to decide. Cen-Fed asserts the ruling was an abuse of discretion that (1) excluded relevant, admissible evidence that would provide historical background for the expansion and development of CGL coverage, and (2) excluded evidence of how the contractually assumed liability exclusion in coverage B is applied by Golden Eagle. Cen-Fed also sought to introduce FC&S bulletins as evidence of the insurance industry's own construction of language in the subject insurance policies, and it contends the trial court abused its discretion in not admitting that evidence. In light of the conclusions we have reached as to the lack of coverage under either coverage A or coverage B, and the reasons therefore, we have no need to discuss this evidentiary contention raised by Cen-Fed.

no coverage under the policies and there never was a duty to defend.[14] Golden Eagle challenges that ruling.

Under the policies' supplementary payments provisions for coverage A and coverage B, Golden Eagle promised to pay, "with respect to . . . any 'suit' against an insured we defend," "[a]ll costs taxed against the insured in the 'suit.'" The policies define the word "suit" as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies are alleged."

In support of its ruling, the trial court cited *Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890 [101 Cal.Rptr.2d 298] (*Prichard*). In *Prichard*, the court addressed a supplemental payments provision for payment of an insured's defense costs that had the same language as the subject policies in the case before us. The *Prichard* court stated the supplementary payments provision "is a function of [Golden Eagle's] defense obligation, not its indemnity obligation." (*Id.* at pp. 911–912.) In that case, the insurer *owed* a duty to defend at least one of the claims asserted against its insured. That, of course, is not the case here; and that distinction makes all the difference.

---

[14] In the instant case, Golden Eagle purported to "acknowledge," in its motion for summary adjudication of issues, that there was a potential for coverage based on facts alleged in WMB's complaint in the underlying suit, specifically a potential personal injury claim that WMB could be determined to have against Cen-Fed based on the policies' "wrongful eviction" provisions, in the event the policies' contractual liability exclusion was not applicable. However, that potential for coverage was decided against Cen-Fed as a matter of law by our decision in *Mirpad, supra*, 132 Cal.App.4th at page 1070 et seq., where, as noted earlier, we held that when an insurance policy consistently distinguishes between natural persons and organizations, those distinct meanings have to be applied by courts, and thus there, as here, the wrongful eviction coverage in the policies was directed at victims who are natural persons, not organizations such as WMB. Therefore, whatever the facts were in the underlying action with respect to potential coverage if the lessee had been a natural person rather than WMB, *as a matter of law* under *Mirpad*, there was no potential for personal injury coverage in that suit.

Golden Eagle also stated in a written status conference summary of its case that it was not disputing its duty to defend. However, in the same breath, Golden Eagle stated it was disputing "the extent of any possible indemnity obligation," and it set out its reasons for asserting that it has no indemnity liability under coverage A or coverage B. Thus, by asserting that there was no possibility of coverage, Golden Eagle necessarily was asserting that it did not have a duty to defend.

Moreover, Golden Eagle maintains in this appeal that it had no duty to defend. Cen-Fed contends Golden Eagle is judicially estopped and equitably estopped from asserting on appeal that it had no duty to defend Cen-Fed in the underlying action because Golden Eagle took the opposite position in the trial court. The elements of judicial estoppel are not established here. Golden Eagle received no benefit from its earlier position (in this *same* case). Indeed, the absence of any duty to defend in fact was litigated in the trial court and the issue was resolved in Golden Eagle's favor in spite of some of its initial inconsistent statements. The purpose of judicial estoppel is to protect the integrity of the judicial process, not the parties to the lawsuit. (*International Engine Parts, Inc. v. Feddersen & Co.* (1998) 64 Cal.App.4th 345, 350 [75 Cal.Rptr.2d 178].)

■ "The duty to defend depends on whether there is potential [indemnity] liability based on *facts* pled in the complaint or known to [Golden Eagle]. There is no duty 'where the only potential for liability turns on resolution of a legal question. . . .' [Citation.]" (*McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1151 [29 Cal.Rptr.2d 559], original italics.) Thus, if the potential for indemnity liability in this case had turned on disputed *factual* issues, Golden Eagle would have been required to provide a defense at least until the facts were conclusively decided to show that there is no coverage and thus no duty to defend. (*Montrose Chemical Corp. v. Superior Court, supra*, 6 Cal.4th at p. 299.)

■ In contrast to an insurer's duty to indemnify, which requires a determination of *actual* coverage (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 659, fn. 9 [42 Cal.Rptr.2d 324, 913 P.2d 878]), its duty to defend runs to claims that are merely potentially covered. (*Montrose Chemical Corp. v. Superior Court, supra*, 6 Cal.4th at p. 295.) But there must be potential coverage for at least one of the claims asserted against the insured. In an action where *none* of the claims is even potentially covered, the insurer has no duty to defend. (*Waller, supra*, 11 Cal.4th at p. 29.) "[T]he duty to defend goes to any action seeking damages for any *covered* claim." (*Buss v. Superior Court, supra*, 16 Cal.4th at p. 48, italics added.) Thus, "the insurer has a duty to defend as to the claims that are at least potentially covered, but not as to those that are not. [Citation.] Even if the policy's language were unclear, the hypothetical insured could not have an objectively reasonable expectation otherwise." (*Id.* at p. 49.)

Since, as we have held, Golden Eagle never had any duty, *as a matter of law*, to indemnify Cen-Fed for the claims asserted by WMB, it likewise never had any duty to defend the action. What impact does that conclusion have on the enforcement of the supplementary payments provision of the Golden Eagle policies? Does it matter that Golden Eagle in fact provided a defense? The trial court answered these questions differently than we do.

The trial court relied on *Prichard, supra*, 84 Cal.App.4th 890 and *San Diego Housing Com. v. Industrial Indemnity Co.* (2002) 95 Cal.App.4th 669 [116 Cal.Rptr.2d 103] (*San Diego Housing*). That reliance was misplaced. The trial court erroneously found those cases persuasive to support a rule which, even if correct based on their facts, would not apply to the case before us. The critical and dispositive distinction is that *Prichard*, and *San Diego Housing*,

were cases, contrary to this case, where the insurer *did* owe a duty to defend the entire case.[15] Thus, *Prichard* and *San Diego Housing* are profoundly distinct from the instant action, where the trial court correctly determined that the insurer never had a duty to defend *any* cause of action or claim.

The *Prichard* court itself specifically distinguished its circumstances from those found in *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165 [96 Cal.Rptr.2d 136], where there never was a duty to defend, but the insurer mistakenly defended its insured. (*Prichard, supra,* 84 Cal.App.4th at pp. 902–903.) The case before us is more closely analogous to *Ringler* in that here there never was a potential for coverage from the outset. WMB's pleadings in the underlying action did not raise a potential for coverage and no claims were asserted at any time except those for breach of the lease contract and the resulting *contract* damages. The case went to the jury on the same breach of contract theory that had been alleged in the initial complaint. The jury entered an award on WMB's breach of lease cause of action in the form of diminution of leasehold value; that is, economic harm arising from a breach of the lease and not for property damage.

In concluding that a supplementary payment obligation could exist even in the absence of a duty to defend, the trial court ignored analogous case law. In *Amex Assurance Co. v. Allstate Ins. Co.* (2003) 112 Cal.App.4th 1246 [5 Cal.Rptr.3d 744], the court held that an "Additional Protection" provision in an Allstate homeowners policy, analogous to the supplementary payment provision found in the standard form liability policy, would not cover costs where there was no duty to defend. The court stated: "Amex argues that the words 'any suit' mean Allstate has a duty to pay for the cost of [the insured's] defense, regardless whether it had a duty to provide defense counsel or to indemnify. But Amex takes the words out of context. No reasonable insured would expect Allstate to pay defense costs for any and every suit, regardless whether the suit potentially seeks damages within the coverage of the policy." (*Id.* at p. 1253; see also *Home Indemnity Co. v. Avol* (C.D.Cal. 1989) 706 F.Supp. 728, 729–730, fn. 2 [which noted that supplementary payments coverage would not apply absent some underlying coverage].)

---

[15] In *San Diego Housing*, it must be noted, the insurer did not provide a defense although it apparently owed one to its insured. The court's opinion primarily focused on the claimed right of the third party claimant who had obtained a default judgment against the insured and thereafter sought to enforce the insured's rights under the supplementary payments clause in a "direct action" against the insurer. (Ins. Code, § 11580, subd. (b)(2).) The court held that a third party could not obtain such recovery absent an assignment of rights from the insured.

In addition, and perhaps most important, the trial court's decision failed to recognize the anomalous consequences that flow from a rule permitting the enforcement of the supplementary payments clause in circumstances such as those before us. The trial court's ruling, if taken to its logical conclusion, would lead to results which are inconsistent with the fundamental principles underlying the duty to defend. The trial court's decision would discourage, rather than encourage, an insurer to defend an insured in cases of doubtful coverage. An insurer that questions coverage is entitled to reserve its rights and then go ahead and provide its insured with a defense and obtain reimbursement of its defense costs where it is subsequently determined that no defense was ever owed. (*Scottsdale, supra,* 36 Cal.4th at p. 657.)

The principles establishing this process are now settled. As the Supreme Court recently put it, "we have made clear that where the third party suit never presented any potential for policy coverage, the duty to defend does not arise in the first instance, and the insurer may properly deny a defense. Moreover, the law governing the insurer's duty to defend need not be settled at the time the insurer makes its decision. As several courts have explained, *subsequent* case law can establish, in hindsight, that no duty to defend ever existed. 'If the terms of the policy provide no potential for coverage, . . . the insurer acts properly in denying a defense *even if that duty is later evaluated under case law that did not exist at the time of the defense tender.* [Citations.]' [Citations.] [¶] . . . These principles are equally true where, as here, the insurer does not deny a defense at the outset, but instead elects to provide one under a reservation of its right to reimbursement. By law applied in hindsight, courts can determine that no potential for coverage, and thus no duty to defend, ever existed. If that conclusion is reached, the insurer, having reserved its right, may recover from its insured the costs it expended to provide a defense which, under its contract of insurance, it was never obliged to furnish." (*Scottsdale, supra,* 36 Cal.4th at pp. 657–658, original italics.). This is precisely what has occurred in this case.[16]

Because of the trial court's erroneous ruling, Golden Eagle's decision to provide a defense to Cen-Fed while it sought declaratory relief as to the existence of coverage exposed it to an unfair and prejudicial burden. Had it denied coverage and refused to defend, Golden Eagle would have avoided incurring any defense costs on Cen-Fed's behalf; and at the same time, it would not now have exposure for the costs and attorney's fee award entered against Cen-Fed under the supplementary payments provision. By electing to

---

[16] In its briefs on appeal, Golden Eagle argues its entitlement to recover its defense costs. It does not appear, however, that it sought such relief in its complaint and thus the trial court never reached the issue. Whether it should be allowed to amend its complaint and whether it properly reserved its rights to recover such costs (see fn. 4, *ante*), are issues that we leave to the initial consideration of the trial court on remand.

err on the side of caution and prudence, and defending under a reservation of rights while seeking declaratory relief on the coverage issue, Golden Eagle incurred many thousands of dollars in defense costs; and, as if to demonstrate that no good deed goes unpunished, the result of its protective action has been exposure to a very substantial cost and attorney's fee burden under the policy's supplementary payments clause.

The trial court's literal application of the supplementary payments clause to a case where no defense duty ever existed undermines the well-settled policy of encouraging insurers to step forward and provide a defense even in those cases of doubtful or disputed coverage. To endorse the trial court's ruling would effectively penalize the insurer providing a conditional defense to its insured and would create a substantial disincentive for insurers to do so.

The trial court's judgment regarding the supplementary payments clause is also inconsistent with an insurer's right to seek reimbursement of defense costs where it is determined that no defense was owed and the insurer has provided a defense under a full reservation of rights. (*Scottsdale, supra*, 36 Cal.4th at pp. 657–658.) If, as *Scottsdale* makes clear, Golden Eagle would be entitled to recoup from Cen-Fed all of its properly reserved defense costs, then why would that not also extend to any supplementary payments obligation it might otherwise have under a literal reading of the policy. In this case, it seems worse than anomalous to allow Golden Eagle to recover its own defense costs, but then turn around and require it to pay the costs and attorney's fees awarded against Cen-Fed. The liability for such supplementary payment is an integral part of the Golden Eagle defense burden. (See *Insurance Co. of North America v. National American Ins. Co.* (1995) 37 Cal.App.4th 195, 206–207 [43 Cal.Rptr.2d 518].)[17] Since no defense liability ever existed, Golden Eagle should likewise have no obligation under the supplementary payments provision. That clause must necessarily be read as applying *only* to those cases where the insurer actually owed a duty to defend. To read it otherwise conflicts with common sense, is contrary to the public policy of encouraging rather than discouraging liability insurers to provide a defense to an insured, and obviously would not be within the *objectively* reasonable expectations of any party to the policy.

---

[17] We disagree with what appears to be a suggestion to the contrary in *Combs v. State Farm Fire & Casualty Co.* (2006) 143 Cal.App.4th 1338, 1346 [49 Cal.Rptr.3d 917].

## *DISPOSITION*

The fourth paragraph of the judgment is amended to state, with respect to Golden Eagle's request for declaratory relief on the issue of whether Golden Eagle has a duty to pay the costs of suit, including attorney's fees, awarded to WMB in the underlying action, that no such duty exists because there never was a duty to defend the underlying action and Golden Eagle is not liable to pay such costs and attorney's fees. As so amended, the judgment is affirmed. Golden Eagle shall recover its costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied April 11, 2007, and the petition of defendants and appellants for review by the Supreme Court was denied June 20, 2007, S152323.